**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| ) | |
| **IN RE VASO ACTIVE** ) | **Master Docket No. 04-10792-RCL** |
| **PHARMACEUTICALS, INC.** ) | **(Consolidated Derivative Action)** |
| **DERIVATIVE LITIGATION** ) | |
| ) | **JURY TRIAL DEMANDED** |

**VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
FOR BREACH OF FIDUCIARY DUTIES, ABUSE OF CONTROL, GROSS
MISMANAGEMENT, WASTE OF CORPORATE ASSETS AND UNJUST
ENRICHMENT**

**NATURE OF THE ACTION**

1.     This is a consolidated shareholder derivative action brought by shareholders of nominal defendant Vaso Active Pharmaceuticals, Inc. ("Vaso" or the "Company"), on behalf of the Company against certain of its current and/or former members of its Board of Directors (the "Board") and top officers and its controlling shareholder to remedy defendants' breaches of fiduciary duties and other violations of law which have inflicted millions of dollars in damages upon Vaso's reputation, goodwill and standing in the business community and have exposed it to millions of dollars in potential liability for violations of state and federal law.  This action arises out of defendants causing Vaso to file admittedly false financial statements and to issue admittedly misleading statements and conceal material facts from investors and the public concerning certain of the Company's key and primary products under review by the Food and Drug Administration ("FDA"), between December 11, 2003 and March 31, 2004 (the "Relevant Period").  Defendants' misconduct has caused severe, irreparable,

1

injury and damages to the Company, particularly to its reputation and goodwill in the investment and business community, and has virtually destroyed this once valuable franchise.

2.      In addition, for at least the foreseeable future, the Company will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled securities analysts and the investing public, such that Vaso's ability to raise capital -- on favorable terms -- will be impaired in the future.  This "discount" already has, and is expected to continue to have, a destructive effect on Vaso's ability to operate, including, but not limited to:

- having the Securities and Exchange Commission ("SEC") suspend trading of the Company's common stock;

- forcing the Company to voluntarily have its common stock removed by the Nasdaq Stock Market, Inc. ("Nasdaq") resulting in its securities being delisted from Nasdaq effective April 8, 2004;

- having the SEC to file a complaint against the Company and its former President, Chief Executive Officer ("CEO") and Chairman, John J. Masiz ("Masiz") for violations of the federal securities law for issuing materially false and misleading statements in the Company's registration statement, Form 10-KSB and on the Company's website resulting in both having to enter into consent decrees and settlements wherein the Company was permanently enjoined from violating the antifraud and reporting provisions of the Securities Exchange Act, and defendant Masiz having to pay a $80,000 file and agree to be barred from serving as an officer or director of any public company for a period of five years;

- causing the Company to lose millions in valuable market capitalization;

- causing the Company to be exposed to tens of millions of dollars in potential liability for violations of federal and state law, including the federal securities laws, which will cost the Company millions to defend and tens of millions more to settle;

- causing the Company to have to unwind a private transaction of $7.5 million entered into with a an institutional investor causing the Company to have to waste over $600,000 in expense reimbursements and fees paid to third parties;

- causing the Company to incur and waste approximately $870,000 in legal and professional fees to amend its previously filed annual report, for representation before the SEC and FDA and to defend itself in shareholder class actions brought against the Company; and

- causing the Company to suffer severe and irreparable damage to its credibility, reputation and goodwill.

### SUMMARY OF THE ACTION

3.     Vaso is an early stage company focused on the commercialization, marketing, and sale of over-the-counter ("OTC") pharmaceutical products that incorporated a patented transdermal (*i.e.*, through the skin) drug technology, which was exclusively licensed to Vaso by its parent company and defendant, BioChemics, Inc. ("BioChemics").  This transdermal technology, which was referred to in the Company's SEC filings as vaso active lipid encapsulated, or VALE, transdermal delivery technology was purported to provide "a highly efficient, reliable and targeted method of drug delivery" into the bloodstream, "that does not require the use of a needle or patch and eliminates many of the common side effects of pills, such as bleeding and ulcers."

4.     On July 7, 2003, the defendants caused Vaso to file a Form SB-2 registration statement and to subsequently file Forms SB-2/A amended registration statements on September 12, 2003, October 16, 2003, November 13, 2003 and December 9, 2003 (collectively, the "Registration Statement").

5.     The defendants caused the Company to represent in its Registration Statement that Vaso had begun marketing and was preparing for the commercial launch of three OTC, transdermal drug products -- Athlete's Relief, Osteon and deFEET

(subsequently rebranded and renamed Termin8) (collectively, the "Current Products") -- two of which, deFEET and Athlete's Releif, purportedly employed Vaso's exclusive VALE transdermal drug delivery technology.   The defendants also caused the Company to falsely represent in the Registration Statement that Vaso's Current Products "have been through the research and development, pre-clinical study and clinical trial states and have received FDA approval."   The now admittedly false Registration Statement was signed by each of the individual defendants defined in ¶¶23-30, below.

6.    Based upon this false Registration Statement the defendants caused Vaso to conduct an initial public offering ("IPO") of its common stock at a price of $5.00 per share raising over $8.3 million in gross proceeds and approximately $6.4 million in net proceeds.   Additionally, through these false representations, the Company was able to raise an additional $7.5 million in a private placement of its securities with an institutional investor and pay for marketing and advertising services with warrants to purchase Vaso's common stock.

7.    During the Relevant Period, the defendants caused Vaso to continue to falsely represent that the Company's Current Products were compliant with FDA rules and regulations and were ready for commercial launch.   These false representations concerning the Company's Current Products were also contained in the Company's Annual Report on Form 10-KSB for the year ended December 31, 2003 filed with the SEC on March 26, 2004 and also signed by each of the individual defendants.   However, the claims the defendants caused the Company to make regarding its Current Products were, as later admitted, materially false and misleading because as the truth eventually revealed Vaso had not, and has not, received any approval from the FDA for the

marketing or sale of any of its OTC drug products. Additionally, because the Current Products were represented to employ a new mode of drug administration, *i.e.*, transdermal, that had not been considered by the FDA as "generally recognized as same and effective, or GRASE," these products were not even eligible for participation in the FDA's OTC Review Program. Thus, the Company was required to obtain pre-market approval from the FDA in the form of an approved new drug application ("NDA") or abbreviated new drug application ("ANDA") before it could market or sell its Current Products.

8.      On February 5, 2004, the SEC and the FDA announced plans to work together in an attempt to crack down on companies that make false and misleading statements concerning their products under review by the FDA. On that date, the SEC issued a press release entitled "SEC and FDA Take Steps to Enhance Inter-Agency Cooperation," which stated in relevant part:

> The Securities and Exchange Commission announced today that members of its senior staff and senior personnel of the Food and Drug Administration (FDA) are continuing and enhancing their cooperative efforts in support of the Commission's activities. An exchange of letters memorializes the initiatives to be taken by the FDA to support the Commission in carrying out its mission to protect investors and maintain the integrity of the nation's securities markets.
>
> The FDA generally assists the Commission by: (1) providing technical assistance, when appropriate, to the Division of Corporation Finance in its review of Commission filings, and (2) providing documents and information to the Division of Enforcement. These forms of assistance to the staff will continue, but with certain enhancements.
>
> Among the initiatives described in the letters exchanged by the SEC and FDA staff are:
>
> - A centralized procedure adopted by the FDA for referring to the SEC staff possible instances of securities laws violations by public companies regulated by the FDA.

- Identification of contacts in each of the FDA's main organizational components (known as Centers) to serve as points of contact for the SEC and its staff to use in requesting information from FDA. These individuals would be responsible for assuring that such requests are handled promptly and thoroughly.

- The continued sharing of non-public information by the FDA with the SEC, consistent with FDA's current practice, and a commitment to endeavor to take steps to further expedite this process.

Stephen M. Cutler, Director of the Commission's Division of Enforcement, and a signatory of the SEC's letter, said, "The Commission staff appreciates FDA's strong interest in coordinating our agencies' activities in a cooperative manner. ***When companies misrepresent the status of the FDA's review of their products, investors can be harmed. We are eager to continue working with the FDA to aggressively address such situations and to enhance our already-productive relationship***."

9.     On April 1, 2004, the SEC issued a Trading Suspension release which stated it was temporarily suspending trading of Vaso's common stock effective on that date "because of questions regarding the accuracy of assertions by [Vaso] and by others, in press releases, its annual report, its registration statement and public statements to investors concerning, among other things: (1) FDA approval of certain key products, and (2) the regulatory consequences of the future application of their primary product."

10.     On April 7, 2004, the defendants caused the Company to issue a press release confirming the suspension of its stock by the SEC and stating it had been notified by Nasdaq that its common stock would be delisted effective upon the opening of the market the next day. The press release also stated in relevant part:

On April 5, 2004, representatives of the Company, together with newly retained special securities counsel and newly retained FDA counsel, met with the Staff of the Commission (the "Staff") for the purpose of discussing the concerns that led to the suspension of trading of the Company's securities. During that meeting, the Company stated its intention to review its public disclosure, press releases and other public

6

statements and to take whatever remedial action may be appropriate. It also represented that it would diligently seek to clarify the status of its products under current FDA regulations, would issue disclosure regarding the FDA regulation of its activities and products and the results of its dialogue with the FDA, and would endeavor to resolve on a timely basis any concerns communicated by the Staff. ***The Staff stated that it had been authorized by the Commission to seek injunctive relief against the Company, articulated the concerns that gave rise to the suspension of trading, and informally requested that the Company provide certain information to the Staff. The Company agreed to cooperate with the Staff, committed to review its disclosure promptly and committed to take any remedial action that may be required.***

The Company cannot predict what, if any, actions may be taken by the Commission; nor is the Company aware whether the FDA is contemplating any action against the Company. The Company, through counsel, intends to commence dialogue with the FDA promptly to address any FDA concerns.

***Due to the ongoing nature of this matter, the Company is unable to assess definitively its impact, except that the Company has committed not to sell its products until this matter has been concluded to the satisfaction of the Commission. The commitment to refrain from selling the Company's products may have a material adverse impact on the Company. The Company will make public announcements and will file public reports with the Commission, when appropriate, including a complete description of regulations applicable to the Company's products and operations, as well as disclosure regarding the status of its products under applicable FDA regulations. No estimate can be given as to the date when the Company's efforts to revise its disclosure will be completed; nor can any estimate be given as to the date when its securities will resume trading. However, the Company is reasonably certain that the necessary disclosures and filings will not be made prior to the termination of the current trading suspension, and, therefore, the Company believes that its securities will not be able to be traded at that time. The Company will not seek to have its securities resume trading until it is reasonably comfortable that the concerns that gave rise to the trading suspension have been satisfactorily resolved.***

11.    As a result, the defendants caused the Company to voluntarily remove its

from Nasdaq and the Company's securities were delisted from Nasdaq effective April 8,

2004.  On March 31, 2004 the day before the trading suspension, the Company's stock

closed at $7.59 per share.  After the trading suspension, the Company's stock resumed

trading on April 16, 2004 on the National Quotation Service Bureau ("Pink Sheets") and the Company's stock closed that day a $1.75 per share representing a 77% decline form its closing price on March 31, 2004 and resulting in a loss of $60.3 million in market capitalization. The Company's stock continued to decline, becoming a penny stock and dropping to a low to $.38 per share. The Company's stock continues to be a penny stock trading only on the Pink Sheets and has not traded over at over $1.00 since September 1, 2004.

12.    On August 17, 2004, the SEC, after consultation with the FDA concerning Vaso, filed a complaint against the Company and Masiz, alleging they knowingly or recklessly made material misrepresentations and omissions in public statements and in the Company's filings made with the SEC by falsely claiming that, among other things, Vaso's Current Products had received FDA approval. On September 13, 2004, the Company and Masiz settled with the SEC entering into Consent Decrees and Final Judgements wherein the Company was permanently enjoined from violating the antifraud and reporting provisions of the Securities Exchange Act, and defendant Masiz had to pay a $80,000 fine and agree to be barred from serving as an officer or director of any public company for a period of five years.

13.    On July 21, 2004, the defendants caused the Company to restate its Annual Report on Form 10-KSB for the year ended December 31, 2003, correcting various false and misleading statements concerning the Company's Current Products as originally reported in its Form 10-KSB filed on March 26, 2004. The restatement constitutes an admission that the Company's Annual Report filed on March 26, 2004, signed by each of the individual defendants, was materially false and misleading.

14.     As a direct result of this illegal course of conduct, the Company has been exposed to tens of millions of dollars in potential liability for violations of the nation's securities laws and regulations and was named in numerous federal securities class action lawsuits filed in the United States District Court for the District of Massachusetts, on behalf of investors who purchased Vaso shares.  These lawsuits were consolidated into a single action before this Court captioned *In re Vaso Active Pharmaceuticals Securities Litigation*, Case No. 04-10708-RCL.  The consolidated class action complaint in the securities fraud suit alleges that investors purchased shares of the Company based on false and materially misleading statements regarding the financial condition of the Company and that they have been significantly damaged thereby.   Even worse, in the consolidated class action complaint the Company has been subjected to strict liability under Section 11 of the Securities Act of 1933 for filing a false and misleading Registration Statement.

15.     Moreover, as noted above, the defendants caused the Company to enter into a private transaction of $7.5 million with an institutional investor on March 16, 2004. The investment was in the form of an 18 month 2% Convertible Note, convertible into shares of the Company's Class A common stock at a conversion rate of $9 per share, at the option of the investor.  Also, the Company issued the investor warrants to purchase 166,667 shares of Class A common stock at an exercise price of $4.75.  However, because the trading suspension of the Company's stock constituted a breach under the Note, the Company entered into a settlement with the investor agreeing to return the $7.5 million plus expense reimbursements of $15,000.  Even more damaging, in connection with this transaction, the Company had paid approximately $600,000 in fees to various

third-parties which were not refunded when the Company repaid the investor and thus the Company had to record these fees as expenses in the first quarter ended March 31, 2004.

16.    Additionally, for the nine months ended September 30, 2004, the Company had to incur and waste approximately $870,000 in legal and professional fees to amend its previously filed annual report, for representation before the SEC and FDA and to defend itself in the shareholder class actions.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C.  1332(a)(2), because complete diversity exists between the plaintiffs and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive one to confer jurisdiction on this Court it would not otherwise have.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

18.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with Massachusetts so as to render the exercise of jurisdiction by the Massachusetts courts permissible under traditional notions of fair play and substantial justice.

19.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Vaso occurred in this

District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

20.    Plaintiffs Joseph Rosenkrantz, a citizen of California, and William Pomeroy, a citizen of Pennsylvania, were at relevant times complained of herein, shareholders of nominal defendant Vaso.

21.    Nominal defendant Vaso is a Delaware corporation with its principal executive offices located in Danvers, Massachusetts.  Defendant BioChemics is the Company's controlling shareholder.  As reported in the Company's Proxy Statement: "BioChemics, Inc. owns all the Company's Class B common stock. Because our Class B common stock has three votes per share, BioChemics controls 70% of the total votes outstanding.  Our President and Chief Executive Officer John Masiz is also Chief Executive Officer, President and Contolling stockholder of BioChemics." The Company began as a division of BioChemics in January 2001 and has operated as a independent entity since January 2003.  The Company received initial funding from BioChemics and has numerous financial transactions with BioChemics including a Licensing Agreement, Manufacturing and Development Agreement, a Registration Rights Agreement as well an Office Space, Administrative Services and Financial Support Agreements.

22.    Defendant BioChemics is the parent company of Vaso and its controlling and majority shareholder.  As of September 24, 2004, BioChemics owned approximately 44% of Vaso's combined classes of issued and outstanding common stock and 70% of the voting power of the Company's combined classes of issues and outstanding stock. As a controlling shareholder, BioChemics owes the Company and its shareholders a fiduciary

duty. The Company began as a division of BioChemics in January 2001 and has operated as a independent entity since January 2003.  The Company received initial funding from BioChemics and has numerous financial transactions with the BioChemics including a Licensing Agreement, Manufacturing and Development Agreement, a Registration Rights Agreement as well an Office Space, Administrative Services and Financial Support Agreements.  During the Relevant Period, defendant Masiz was Chief Executive Officer ("CEO") and Chairman the Board of BioChemics and Vaso.  Defendant Stephen G. Carter ("Carter") was Chief Scientific Officer ("CSO") of BioChemics and Vaso.  The Company's deFEET product was introduced to the marketplace by BioChemics while the Company was still a division of BioChemics. As stated in the Company's Registration Statement filed on December 11, 2003, "[w]e depend on BioChemics to provide us with certain support and services.  The loss of such support and services would have a material adverse effect on our business." In addition, Vaso has limited product development capabilities and no manufacturing ability.  As a result, the Company is dependent upon BioChemics to manufacture its products.  By virtue of the foregoing, BioChemics was aware of the Company's false and misleading statements regarding its Current Products and breached its fiduciary duties by participating in and/or failing to correct the Company's improper financial statements and press releases described herein. BioChemics was not only a controlling shareholder but also exercised control over the business affairs of Vaso.  Indeed, BioChemics directly participated in the misconduct and breached its fiduciary duty by directing and paying for the so-called "pilot clinical trial," discussed below, in regards to deFEET which enabled the individual defendants to cause Vaso to subsequently issue materially false and misleading statements in regards to.

23.     Defendant Masiz was, during the Relevant Period, Chairman of the Board, CEO and President of Vaso.  Masiz is a citizen of Massachusetts.  In accordance with the terms of the SEC settlement which prohibits him for serving as an officer or director of any public Company, including Vaso, Masiz resigned as an executive officer and director of the Company effective August 17, 2004.  Masiz now serves as a consultant to the Company.  As an officer and director of Vaso, Masiz owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Moreover, as Chairman, CEO and President, Masiz had also assumed important managerial responsibilities at Vaso which required him to be well informed about the day-to-day operations of the Company.  Rather than fulfill these important fiduciary duties Masiz owed to Vaso and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Vaso by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. As a result of his significant ownership of the Company's Class A and B common stock, as of March 18, 2004, Masiz beneficially owned shares representing approximately 70% of the combined voting power of the outstanding common stock of the Company and thus as stated in the Company's Registration Statement filed on December 11, 2003 "control[s] the outcome of stockholder votes, including votes concerning the election of ... directors." Thus, Masiz totally dominated and controlled Vaso's Board.  Masiz was also Chairman and CEO of BioChemics, the Company's controlling shareholder and defendant Carter was BioChemics CSO.  Masiz signed the Company's materially false and misleading Registration Statement and Annual Report for Fiscal Year ("FY") 2003 and also as CEO,

falsely certified the Annual Report and also made other false and misleading statements during the Relevant Period and thus is a direct participant in the wrongdoing. Masiz is a named defendant in *In re Vaso Active Pharmaceuticals Securities Litigation*, Case No. 04-10708-RCL and has answered in that action. In addition to his annual salary of $175,000 per year, at the time this action was initiated, Masiz owned 300,000 options to purchase Vaso stock. According to the Company's 2003 Stock Incentive Plan, if Masiz's employment is terminated, these options, including those not vested and exercisable as well as those already vested and exercisable, will expire and be forfeited. Thus, as these options run into the millions of dollars, Masiz had every incentive to maintain his position at Vaso at the time this action was initiated. By virtue of his executive positions with Vaso, his long term personal, professional and financial relationships with defendants Carter, Kevin J. Seifert ("Seifert") and other members of the Vaso Board, his personal participation in the underlying misconduct for which is faces a substantial likelihood of liability, and his substantial ownership of Vaso stock options, Masiz was not disinterested, was not independent and could not have adequately considered a pre-suit demand to bring the allegations contained herein at the time this action was initiated.

24.     Defendant Seifert was, since February 19, 2004, a director and during all relevant times, Chief Operating Officer ("COO") of Vaso. Seifert is a citizen of New Jersey. As an officer and director of Vaso, Seifert owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as COO, Seifert had also assumed important managerial responsibilities at Vaso which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Seifert

14

owed to Vaso and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Vaso by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Seifert signed the Company's materially false and misleading Annual Report for FY:03 and thus is a direct participant in the wrongdoing. In addition to his annual salary of $200,000 per year and bonus of $150,000 for FY:03, Seifert currently owns 225,000 options to purchase Vaso stock. According to the Company's 2003 Stock Incentive Plan, if Seifert's employment is terminated, these options, including those not vested and exercisable as well as those already vested and exercisable, will expire and be forfeited. Thus, as these options run into the hundreds of thousands of dollars, Seifert had every incentive to maintain his position at Vaso. By virtue of his executive positions with Vaso, his long term personal, professional and financial relationships with defendants Masiz, Carter and other members of the Vaso Board, his personal participation in the underlying misconduct, and his substantial ownership of Vaso stock options, Seifert was not disinterested, was not independent and could not have adequately considered a pre-suit demand to bring the allegations contained herein, at the time this action was initiated.

25.     Defendant Carter was, during the Relevant Period, a director and CSO of Vaso. Carter is a citizen of Massachusetts. As an officer and director of Vaso, Carter owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as CSO, Carter had also assumed important managerial responsibilities at Vaso which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important

fiduciary duties Carter owed to Vaso and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Vaso by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Carter was, during the Relevant Period, CSO of BioChemics, the Company's controlling shareholder.  Carter signed the Company's materially false and misleading Registration Statement and Annual Report for FY:03 and thus is a direct participant in the wrongdoing.  Carter is a named defendant in *In re Vaso Active Pharmaceuticals Securities Litigation*, Case No. 04-10708-RCL and has answered in that action.  In addition to his annual salary of $140,000 per year, at the time this action was initiated, Carter owned 225,000 options to purchase Vaso stock.  According to the Company's 2003 Stock Incentive Plan, if Carter's employment is terminated, these options, including those not vested and exercisable as well as those already vested and exercisable, will expire and be forfeited. Thus, as these options run into the hundreds of thousands of dollars, Carter had every incentive to maintain his position at Vaso. By virtue of his executive positions with Vaso, his long term personal, professional and financial relationships with defendants Masiz, Seifert and other members of the Vaso Board, his personal participation in the underlying misconduct for which he faces a substantial likelihood of liability, and his substantial ownership of Vaso stock options, Carter was not disinterested, was not independent and could not have adequately considered a pre-suit demand to bring the allegations contained herein at the time this action was initiated.

26.    Defendant Bruce A. Shear ("Shear") was, during the Relevant Period, a director of Vaso and a member of its Audit, Nominating and Compensation Committees.

Shear is a citizen of Massachusetts. As a director of Vaso, Shear owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a member of Vaso's Audit, Nominating and Compensation Committees, Shear had also assumed important managerial responsibilities at Vaso which required him to be well informed about the day-to-day operations of the Company, particularly as a member of the Audit Committee with respect to monitoring the integrity of the financial statements of the Company; ensuring the Company's compliance of all legal and regulatory requirements; and discussing the Company's financial statements with management. Rather than fulfill these important fiduciary duties Shear owed to Vaso and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Vaso by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Shear signed the Company's materially false and misleading Registration Statement and Annual Report for FY:03 and thus is a direct participant in the wrongdoing. Shear is a named defendant in *In re Vaso Active Pharmaceuticals Securities Litigation*, Case No. 04-10708-RCL and has answered in that action. At the time this action was initiated, Shear owned 60,000 options to purchase Vaso stock. According to the Company's 2003 Non-Employee Director Compensation Plan, if Shear's position as a director is terminated, these options, including those not vested and exercisable as well as those already vested and exercisable, will expire and be forfeited. Thus, as these options run into the tens of thousands of dollars, Shear had every incentive to maintain his position at Vaso. By virtue of his position with Vaso, his long term personal, professional and

financial relationships with defendants Masiz, Seifert, Carter and other members of the Vaso Board, his personal participation in the underlying misconduct for which he faces a substantial likelihood of liability, and his substantial ownership of Vaso stock options, Shear was not disinterested, was not independent and could not have adequately considered a pre-suit demand to bring the allegations contained herein at the time this action was initiated.

27.    Defendant Brian J. Strasnick ("Strasnick") was, during the Relevant Period, a director of Vaso and a member of its Audit, Nominating and Compensation Committees.  Strasnick is a citizen of Massachusetts.  As a director of Vaso, Strasnick owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Moreover, as a member of Vaso's Audit, Nominating and Compensation Committees, Strasnick had also assumed important managerial responsibilities at Vaso which required him to be well informed about the day-to-day operations of the Company, particularly as a member of the Audit Committee with respect to monitoring the integrity of the financial statements of the Company and ensuring the Company's compliance of all legal and regulatory requirements; and discussing the Company's financial statements with management.  Rather than fulfill these important fiduciary duties Strasnick owed to Vaso and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Vaso by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Strasnick signed the Company's materially false and misleading Registration Statement and Annual Report for FY:03 and thus is a direct

participant in the wrongdoing.   Strasnick is a named defendant in *In re Vaso Active Pharmaceuticals Securities Litigation*, Case No. 04-10708-RCL and has answered in that action.  At the time this action was initiated, Strasnick owned 60,000 options to purchase Vaso stock. According to the Company's 2003 Non-Employee Director Compensation Plan, if Strasnick's position as a director is terminated, these options, including those not vested and exercisable as well as those already vested and exercisable, will expire and be forfeited. Thus, as these options run into the tens of thousands of dollars, Strasnick had every incentive to maintain his position at Vaso. By virtue of his position with Vaso, his long term personal, professional and financial relationships with defendants Masiz, Seifert, Carter and other members of the Vaso Board, his personal participation in the underlying misconduct for which he faces a substantial likelihood of liability, and his substantial ownership of Vaso stock options, Strasnick was not disinterested, was not independent and could not have adequately considered a pre-suit demand to bring the allegations contained herein at the time this action was initiated.

28.     Defendant William P. Adams ("Adams") was, during the Relevant Period, a director of Vaso and a member of its Nominating Committee and since January 2004 a member of its Compensation Committee.  Adams is a citizen of Massachusetts.  As a director of Vaso, Adams owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Moreover, as a member of Vaso's Nominating and Compensation Committees, Adams had also assumed important managerial responsibilities at Vaso which required him to be well informed about the day-to-day operations of the Company.   Rather than fulfill these important fiduciary duties Adams owed to Vaso and its shareholders he actively participated in or

knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Vaso by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Adams signed the Company's materially false and misleading Registration Statement and Annual Report for FY:03 and thus is a direct participant in the wrongdoing.   Adams is a named defendant in *In re Vaso Active Pharmaceuticals Securities Litigation*, Case No. 04-10708-RCL and has answered in that action.   At the time this action was initiated, Adams owned 60,000 options to purchase Vaso stock. According to the Company's 2003 Non-Employee Director Compensation Plan, if Adams' position as a director is terminated, these options, including those not vested and exercisable as well as those already vested and exercisable, will expire and be forfeited. Thus, as these options run into the tens of thousands of dollars, Adams had every incentive to maintain his position at Vaso. By virtue of his position with Vaso, his long term personal, professional and financial relationships with defendants Masiz, Seifert, Carter and other members of the Vaso Board, his personal participation in the underlying misconduct for which he faces a substantial likelihood of liability, and his substantial ownership of Vaso stock options, Adams was not disinterested, was not independent and could not have adequately considered a pre-suit demand to bring the allegations contained herein at the time this action was initiated.

29.    Defendant Robert E. Anderson ("Anderson") was, during the Relevant Period, a director of Vaso and a member of its Nominating Committee and since January 2004 a member of its Compensation Committee.   Anderson is a citizen of Massachusetts. As a director of Vaso, Anderson owed a duty to the Company and its shareholders to be

reasonably informed about the business and operations of the Company. Moreover, as a member of Vaso's Nominating and Compensation Committees, Anderson had also assumed important managerial responsibilities at Vaso which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Anderson owed to Vaso and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Vaso by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Anderson signed the Company's materially false and misleading Registration Statement and Annual Report for FY:03 and thus is a direct participant in the wrongdoing. Anderson is a named defendant in *In re Vaso Active Pharmaceuticals Securities Litigation*, Case No. 04-10708-RCL and has answered in that action. At the time this action was initiated, Anderson owned 60,000 options to purchase Vaso stock. According to the Company's 2003 Non-Employee Director Compensation Plan, if Anderson's position as a director is terminated, these options, including those not vested and exercisable as well as those already vested and exercisable, will expire and be forfeited. Thus, as these options run into the tens of thousands of dollars, Anderson had every incentive to maintain his position at Vaso. By virtue of his position with Vaso, his long term personal, professional and financial relationships with defendants Masiz, Seifert, Carter and other members of the Vaso Board, his personal participation in the underlying misconduct for which he faces a substantial likelihood of liability, and his substantial ownership of Vaso stock options, Anderson was not disinterested, was not

independent and could not have adequately considered a pre-suit demand to bring the allegations contained herein at the time this action was initiated.

30.    Defendant Gary Fromm ("Fromm") was, during the Relevant Period, a director of Vaso and a member of its Nominating Committee.    Fromm is a citizen of Washington, DC.    As a director of Vaso, Fromm owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.    Moreover, as a member of Vaso's Nominating Committee, Fromm had also assumed important managerial responsibilities at Vaso which required him to be well informed about the day-to-day operations of the Company.    Rather than fulfill these important fiduciary duties Fromm owed to Vaso and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Vaso by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Fromm signed the Company's materially false and misleading Registration Statement and Annual Report for FY:03 and thus is a direct participant in the wrongdoing.    Fromm is a named defendant in *In re Vaso Active Pharmaceuticals Securities Litigation*, Case No. 04-10708-RCL and has answered in that action.    At the time this action was initiated, Fromm owned 60,000 options to purchase Vaso stock. According to the Company's 2003 Non-Employee Director Compensation Plan, if Fromm's position as a director is terminated, these options, including those not vested and exercisable as well as those already vested and exercisable, will expire and be forfeited. Thus, as these options run into the tens of thousands of dollars, Fromm had every incentive to maintain his position at Vaso. By virtue of his position with Vaso, his

long term personal, professional and financial relationships with defendants Masiz, Seifert, Carter and other members of the Vaso Board, his personal participation in the underlying misconduct for which he faces a substantial likelihood of liability, and his substantial ownership of Vaso stock options, Fromm was not disinterested, was not independent and could not have adequately considered a pre-suit demand to bring the allegations contained herein at the time this action was initiated.

31.    Defendant Joseph Frattaroli ("Frattaroli") was, during the Relevant Period, Chief Financial Officer ("CFO") and Secretary of Vaso.  Frattaroli is a citizen of Massachusetts. As an officer of Vaso, Frattaroli owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Moreover, as its CFO and Secretary, Frattaroli had also assumed important managerial responsibilities at Vaso which required him to be well informed about the day-to-day operations of the Company, particularly as CFO with respect to monitoring the integrity of the financial statements of the Company and ensuring the Company's compliance of all legal and regulatory requirements; and discussing the Company's financial statements with management.  Rather than fulfill these important fiduciary duties Frattaroli owed to Vaso and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Vaso by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Frattaroli signed the Company's materially false and misleading Registration Statement and Annual Report for FY:03 and also as CFO falsely certified the Annual Report and thus is a direct participant in the wrongdoing.  Frattaroli is a named defendant in *In re*

*Vaso Active Pharmaceuticals Securities Litigation*, Case No. 04-10708-RCL and has answered in that action.

32.    The defendants identified above in ¶¶23-31 are collectively referred to hereinafter as the "Individual Defendants."  The defendants identified above in ¶¶23-30, who made up Vaso's Board at the time this action was initiated are collectively referred to hereinafter as the "Director Defendants."

## FACTS

## BACKGROUND

33.    Vaso is essentially an early stage company focused on commercializing, marketing and selling OTC pharmaceutical products.  It began its operations as a division of BioChemics, Inc. in January 2001, and has only operated as an entity independent of BioChemics since January 2003.  The Company's operating history was extremely limited.  The deFEET, Athlete's Relief and Osteon products were in the early stages of commercialization as the Company prepared to go public.  With the exception of the introduction of deFEET to the marketplace by BioChemics while the Company was still a division of BioChemics (a company also controlled by Masiz and Carter), it had not yet commercialized, marketed or sold any products or recognized significant revenue from product sales.  The Company focuses on BioChemics' patented VALE transdermal delivery technology drugs which were exclusively licensed to Vaso by BioChemics for use in the OTC products.

34.    Pursuant to the Company's Registration Statement, the Company was able to complete its IPO of 1,450,000 shares of its Class A common stock, plus an over-

allotment of 217,500, at a re-stock split price of $5.00 per share, raising over $8.3 million in gross proceeds and approximately $6.4 million in net proceeds for the Company.

35.    On March 16, 2004, the Company entered into a private transaction of $7.5 million with an institutional investor.  The investment was in the form of an 18 month 2% Convertible Note, convertible into shares of the Company's Class A common stock at a conversion rate of $9 per share, at the option of the investor.  Also, the Company issued the investor warrants to purchase 166,667 shares of Class A common stock at an exercise price of $4.75.  The Individual Defendants caused the Company to describe the transaction in a March 17, 2004 press release entitled "Vaso Active Pharmaceuticals Completes Financing at a Premium," which stated in relevant part:

> Vaso Active Pharmaceuticals, (Vaso Active) of Danvers, Massachusetts, is pleased to announce that it has entered into a private placement transaction in the amount of $7,500,000 with an institutional investor. The investment which is in the form of an 18 month 2% Convertible Note, is convertible into shares of Class A common stock at a conversion rate of $9 per share, at the option of the investor. Both principal and interest are payable in cash or in shares of Class A common stock, at the option of Vaso Active. The purchase agreement includes anti-hedging provisions and the maturity date may be extended for up to two years at the option of the investor. In addition, Vaso Active issued to the investor warrants to purchase 166,667 shares of Class A common stock at an exercise price of $8.75 per share.
>
> Mr. John J. Masiz, President and Chief Executive Officer of Vaso Active was very pleased that Vaso Active was successful in consummating this institutional private placement at what Mr. Masiz considered favorable terms.  "The ability to secure additional funds through the completion of this private placement gives Vaso Active significant new working capital to augment the working capital derived from its IPO.  This will enhance Vaso Active's capital base with which to operate and will permit the Company to take advantage of strategic opportunities that arise in the course of growing our business.  In addition, the execution of this agreement at a premium to the current market price of our common stock underscores the value of our technology to a material investor."

## IMPROPER STATEMENTS AND FINANCIAL REPORTING

### The False Registration Statement

36.     The Company's Registration Statement stated in relevant part:

All three of these products [deFEET, Athlete's Relief and Osteon] *have been through the research and development, pre-clinical study and clinical trial stages and have received FDA approval.* They are either currently being marketed and commercialized or will enter the marketing and commercialization phase upon the consummation of this offering.

*deFEET is a topically-applied, transdermal athlete's foot anti-fungal medication* designed to eliminate athlete's foot infection in less than 10 days. *It employs the VALE drug delivery system* to effectively and efficiently deliver a mild antifungal agent called Tolnaftate into the skin surrounding the affected area. *In a pilot clinical trial, supervised by independent physicians and analyzed by the New England Medical Center in Boston, MA 20 severely infected athlete's foot patients were treated and studied over a 42-day period. There were two groups in the study, one treated with deFEET and the other with Schering-Plough's Tinactin®. In this study deFEET eliminated the infection in 90% of the test group in 7 days and 100% of its patient population in 10 days. Tinactin®, which also uses Tolnaftate, in the same concentration as deFEET, required 42 days to cure its first patient. These results demonstrate the ability of the VALE technology to deliver Tolnaftate much more effectively than a product not utilizing VALE technology .*

\*\*\*

*Osteon is a topically-applied, transdermal arthritis pain reliever* designed to relieve pain within 10-15 minutes of application and which lasts up to 6 hours. We have received favorable consumer and physician comments that Osteon compares favorably to prescription NSAIDS in relieving muscle and joint pain, particularly arthritis pain, without the drug-induced side effects. The annual market for OTC pain relievers and analgesics in the United States is approximately $3.1 billion, while the OTC external analgesic market is approximately $278 million. We believe that the population of 45-64 year olds will grow significantly in the next decade. As the "graying" of the baby-boomer demographic continues, we believe that the market for arthritis pain relief products will continue to grow. We also believe that our Osteon product can effectively penetrate the arthritic pain relief market.

*Athlete's* **Relief** *is a topically-applied, transdermal muscle and joint pain treatment* designed to relieve the pain associated with athletics and physical exertion. Competitive products in this category rely on a

26

chemical induction of the sensation of intense heat or cold on the skin surface. This chemical induction is designed to mask the sensation of pain. In contrast, ***Athlete's Relief uses the VALE transdermal drug delivery technology*** to deliver a natural chemical substance that inhibits the release of specific neurotransmitters that are responsible for transmitting the pain signals to the brain. The result is a true blockage of the pain sensation. The difference between our products and others on the market is our ability to use the VALE technology and thus gain access to the deep tissue nerve endings in order to block their activity. The annual OTC external analgesic market, of which sports injury pain medication is a component, is approximately $278 million in the United States. We believe that our Athlete's Relief will provide an alternative treatment for pain associated with athletics and physical exertion.

37.     The above statements in the Registration Statement that: (i) the Company Current Products - de FEET (renamed Termin8 after the Company's IPO), Athlete's Relief and Osteon - "have been through the research and development, pre-clinical study and clinical trial states and have received FDA approval"; (ii) that the Current Procuts each had a transdermal effect, *i.e.*, that deFEET was a "topically applied, transdermal athlete's foot anti-fungal medication," that Athlete's Relief was a "topically applied, transdermal muscle and joint pain treatment," and that Osteon was a "topically applied, transdermal arthritis pain reliever"; and (iii) that deFEET and Athlete's Relief employed the Company's VALE drug delivery system, were each improper and materially false and misleading when made because:

(a)     As subsequently confirmed by the SEC Complaint and the Company's subsequent disclosures and admissions, neither Vaso nor BioChemics had received FDA approval for any of the Current Products. Additionally, the Registration Statement failed to disclose the FDA regulations concerning the marketing of OTC drugs and the regulatory procedures pursuant to which Vaso or BioChemics had purportedly received "FDA approval" for the Current Products. The Registration Statement also

failed to disclose that Vaso products that were represented as incorporating the Company's VALE technology could not be sold with FDA approval;

(b)    As revealed in the Company's amended Form 10-KSB/A filed with the SEC on July 21, 2004, none of the Current Products had a transdermal effect and none employed the VALE transdermal drug delivery technology, contrary to the representations concerning these products in the Registration Statement.  In fact, for the first time, the amended Form 10-KSB/A stated the Current Products used the Company's "PENtoCORE topical formulation," which, unlike VALE, was not covered by an patents and had only a topical effect, rather than the previously reported transdermal effect of VALE.  In the Company's Registration Statement, PENtoCORE was described only as a registered trademark to BioChemics licensed to Vaso, not as a drug formulation distinct from VALE.  This was the only mention of PENtoCORE in the Registration Statement; and

(c)    As revealed by a March 9, 2004 article in *TheStreet.com* and a March 9, 2004 press release issued by the Company, the so-called "pilot clinical trial" in regards to deFEET was conducted by only one physician hand-picked by BioChemics and was not "supervised by independent physicians."  Additionally, the New England Medical Center's involvement in the clinic was very limited at best.  The medical center was hired by BioChemics to analyze the statistical data compiled by BioChemics, something the center routinely does for paying customers.  Robin Ruthazer, the center employee who analyzed BioChemics' statistics, stated to *TheStreet.com* that she couldn't draw any conclusions about the effectiveness of the product, since she had no hand in selecting the patients and gathering the evidence.  Moreover, the Registration Statement

failed to disclose that the clinical trial was conduced in 1998 -- approximately six years before the IPO.

38.     The false and misleading Registration Statement was signed by each of the Individual Defendants except Seifert.

### The False Annual Report

39.     On March 26, 2004, the Company filed its Annual Report on Form 10-KSB for the year ended December 31, 2003, which was signed by all the Individual Defendants and certified pursuant to Section 302(A) the Sarbanes-Oxley Act of 2002 by defendants Masiz and Frattaroli.  In the Form 10-KSB the Individual Defendants again caused Vaso to represent that the Company was focused "on commercializing, marketing and selling over-the-counter, or OTC, pharmaceutical products that incorporate the vaso active lipid encapsulated, or 'VALE', transdermal drug delivery technology."  The Form 10-KSB also stated that:  "We will market the VALE technology under the PENtoCORE trademark."

40.     The Form 10-KSB included for the following admittedly improper, materially false and misleading statements, which stated: (i) that each of the Company's Current Products - Terminix8, Athlete's Relief, and Osteon - "has been through the research and development state and qualified under FDA OTC monographs and have registered as such"; (ii)  that the Current Products each had a transdermal effect, *i.e*., that Termin8 was a "topically applied, transdermal anti-fungal medication," that Athlete's Relief was a "topically applied, transdermal muscle and joint pain treatment," and that Osteon was a "topically applied, transdermal arthritis pain reliver"; and (iii) that Termin8 employed the Company's VALE transdermal drug deliver system.

41.    The above statements were admittedly improper, materially false and misleading when made because:

(a)    None of the Current Products, to the extent they were represented as employing a transdermal drug delivery system, satisfied the FDA OTC monograph requirements, as subsequently revealed by the SEC Complaint and the Company's subsequent disclosures.  Specifically, VALE was a new delivery system that was not covered under the FDA's OTC Review Program and therefore drugs employing VALE could not be marketed in conformity with an existing OTD drug monograph and required pre-market approval by the FDA.    Additionally, the Individual Defendants caused the Company to:  (i) fail to disclose any of the FDA regulations concerning the marketing of OTC drugs and how Vaso or BioChemics had purportedly determined that the Current Products "qualified under FDA OTC monographs"; and (ii) fail to correct the improper and materially false and misleading statement in the Registration Statement that the Company's Current Products had "received FDA approval"; and

(b)    In the Company's restated and amended Annual Report filed on Form 10-KSB/A, the Individual Defendants caused the Company to reveal for the first time that none of the Current Products had a transdermal effect and none employed the VALE transdermal drug delivery technology, contrary to the express representations concerning these products in the Form 10-KSB.  Specifically, the amended Annual Report on Form 10-KSB/A stated for the first time that the Current Products used the Company's "PENtoCORE topical formulation," which, unlike VALE, was not covered by any patents and had only a topical effect rather than the purported transdermal effect of VALE.  In the Company's Form 10-KSB, PENtoCORE was described only as a registered

trademark, not as a drug formulation distinct from VALE. There was no other mention of PENtoCORE included in the Form 10-KSB.

42.    Pursuant to Section 302(A) of the Sarbanes-Oxley Act of 2002, defendants Masiz and Frattaroli, in their capacities and CEO and CFO of Vaso, respectively, signed certifications which were attached to the Company's Form 10-KSB as Exhibits 31.1 and 31.2, respectively.    Specifically, in the certifications, both Masiz and Frataroli falsely certified that:

> Based upon, my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

43.    The certifications were admittedly and materially false for the reasons set forth in ¶41 above.

### **Other Improper Statements**

44.    On February 19, 2004, the Individual Defendants caused the Company to issue a press release entitled "Vaso Active Pharmaceuticals Declares 3 for 1 Stock Split." The press release stated in  relevant part:

> Vaso Active Pharmaceuticals, Inc. (Vaso Active) of Danvers, Massachusetts, announced today that the Board of Directors has declared a 3 for 1 stock split effective in the form of a 200 percent stock dividend payable on or about March 5, 2004 to holders of record of both Class A and Class B common stock as of February 23, 2004.  Under the terms of this stock split, holders of the Company's Class A and Class B common stock will receive a dividend of two shares of Class A and Class B common stock for every one share of Class A and Class B common stock held on that record date.  The dividend will be paid in authorized but unissued shares of Class A and Class B common stock of the Company.
>
> The Company anticipates that the combined amount of issued and outstanding shares of both the Class A and Class B common stock after the split will be increased from 3,428,000 shares to 10,284,000 shares.

John Masiz, Chief Executive Officer and Chairman of Vaso Active stated. "One of the ways many institutions measure investment appeal is through the liquidity of a security. Recently, there has been significant demand for our common stock at the institutional level. However liquidity has proved to be an obstacle. To help resolve this, the Board of Directors has declared this 3-for-1 stock split to increase our liquidity to the public market place, thus enhancing our securities' appeal to both retail and institutional investors."

45.    This statement was improper because contrary to defendant Masiz's claim that there was significant demand for the Company's stock at an "institutional level" – so much so that the Company, in response to this demand, consummated a three for one stock split – there was *de minimus*, if any, institutional demand for the Company's shares. Moreover, there were no institutional or retail analysts who even followed the Company.

### THE TRUTH IS REVEALED AND THE COMPANY IS SEVERELY DAMAGED

46.    On April 1, 2004, the SEC issued Trading Suspension Release No. 34-49514 entitled "Trading Suspension: Vaso Active Pharmaceuticals, Inc.," stating in relevant part:

> The Securities and Exchange Commission announced the temporary suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934 (the "Exchange Act"), of trading of the securities of Vaso Active Pharmaceuticals, Inc., ("VAPH") of Danvers, Massachusetts at 9:30 a.m. on April 1, 2004, and terminating at 11:59 p.m. on April 15, 2004.

> *The Commission temporarily suspended trading in the securities of VAPH because of questions regarding the accuracy of assertions by VAPH and by others, in press releases, its annual report, its registration statement and public statements to investors concerning, among other things: (1) FDA approval of certain key products, and (2) the regulatory consequences of the future application of their primary product.*

> *The Commission cautions broker dealers, shareholders, and prospective purchasers that they should carefully consider the foregoing*

32

*information along with all other currently available information and
any information subsequently issued by the company.*

Further, brokers and dealers should be alert to the fact that,
pursuant to Rule 15c2-11 under the Exchange Act, at the termination of
the trading suspension, no quotation may be entered unless and until they
have strictly complied with all of the provisions of the rule. If any broker
or dealer has questions as to whether or not he has complied with the rule,
he should not enter any quotation but immediately contact the staff of the
Securities and Exchange Commission in Washington, D.C. If any broker
or dealer is uncertain as to what is required by Rule 15c2-11, he should
refrain from entering quotations relating to VAPH's securities until such
time as he has familiarized himself with the rule and is certain that all of
its provisions have been met. If any broker or dealer enters any quotation,
which is in violation of the rule, the Commission will consider the need
for prompt enforcement action.

If any broker dealer or other person has any information, which
may relate to this matter, the Division of Enforcement of the Securities
and Exchange Commission should be telephoned at (202) 942-4677.

47.     Subsequently, also on April 1, 2004, *Reuters* issued a press release entitled

"UPDATE - SEC suspends trading in Vaso Active stock."  The press release stated in

relevant part:

U.S. securities regulators on Thursday halted trading of Vaso Active
Pharmaceuticals Inc., a marketer of over-the-counter pharmaceuticals,
through April 15.

The Securities and Exchange Commission questioned assertions
made by the Danvers, Massachusetts-based company of an FDA approval
of certain key products and regulatory consequences of the future
application of their primary product, among others.

Vaso Active was not immediately available for comment.

The SEC said it questioned the accuracy of assertions made in the
company's press releases, annual report, registration statement and public
statements to investors.

48. An April 2, 2004 article appearing in the *Boston Globe* entitled "SEC Halts Trading in Danvers Company Questions Claims About Vaso Lotion," stated in relevant part:

The Securities and Exchange Commission yesterday said it suspended trading of Vaso Active Pharmaceuticals Inc. of Danvers for two weeks, questioning the accuracy of statements the maker of an athlete's foot lotion had made about FDA approvals for its products and other regulatory matters. The action halted trading in the tiny company whose shares have more than tripled since the start of the year, and whose board includes a former research dean of Harvard Medical School. It has been the subject of several critical news accounts regarding its communications about its Termin8 antifungal lotion, one of three products based on a method to deliver drugs through the skin.

*The action comes amid growing cooperation between the SEC and the Food and Drug Administration to police the statements of biotech firms, whose value is largely determined by their prospects before drug regulators. When it went public in December, Vaso Active said in a securities filing its three products have received FDA approvals.*

In a statement yesterday the SEC said, referring to the company's stock ticker symbol.... The commission temporarily suspended trading in the securities of VAPH because of questions regarding the accuracy of assertions by VAPH and by others, in press releases, its annual report, its registration statement and public statements to investors concerning among other things: (1) FDA approval of certain key products, and (2) the regulatory consequences of the future application of their primary product.

*Asked about the matter, an FDA spokesman referred a reporter to an online listing of approved drugs. None of three remedies Vaso Active says it got approvals for Termin8, Athlete's Relief, and Osteon appear in the database.*

In the same filing Vaso Active listed the annual market size next to each of various products it has under development, including $800 million for a toenail fungus treatment and over $1 billion for a hand and body lotion. It wasn't clear whether these figures accounted for the second problem identified by the SEC. The company said the figures were based on a retail industry report.

\* \* \*

*In a telephone interview yesterday, one of Vaso's directors, Gary*

*Fromm, acknowledged the company could have done more to clarify the details about studies that had been done on Termin8.*

*There probably should have been better documentation of the studies that were done with regard to the efficacy of the product in company public filings, said Fromm, speaking from London, where he is chairman of Sky Capital UK Ltd., an investment firm.*

\* \*\*

Even before yesterday's action, the company had faced scrutiny in the business press on other topics.

For instance, on March 10 TheStreet.com, a financial news website, reported that Vaso Active had claimed incorrectly that Tufts-New England Medical Center had conducted a clinical trial of Termin8, when the center had only analyzed results of a study done elsewhere. In February Barron's, the financial newsweekly, reported that the head of a medical association couldn't remember endorsing Termin8 as Vaso Active had claimed. (Vaso Active later explained the doctor had endorsed the product under its previous name, deFEET).

Also, according to the company's March 26 proxy statement, several executives were late to file reports describing their ownership in the company including John J. Masiz, its chief executive. The documents were filed late inadvertently, the filing states.

49.    On April 7, 2004, the Individual Defendants caused the Company to issue

a press release entitled "Vaso Active Pharmaceuticals Announces Suspension of Trading

of its Common Stock and Advises That its Public Reports and Certain Other Publicly

Released Information Should Not Be Relied upon and it Has Determined to Cause its

Securities to Be Removed from Nasdaq," which stated in relevant part:

Vaso Active Pharmaceuticals, Inc. today announced that the U.S. Securities and Exchange Commission (the "Commission") temporarily suspended trading of the securities of Vaso Active Pharmaceuticals, Inc. ("VAPH"), effective 9:30 a.m. on April 1, 2004. The suspension, by its terms, terminates at 11:59 p.m. on April 15, 2004. The Commission also stated that it temporarily suspended trading in the securities of the Company because of questions regarding the accuracy of assertions by the Company and by others, in press releases, its annual report, its registration statement and public statements to investors concerning, among other

35

things: (1) the U.S. Food and Drug Administration ("FDA") approval of certain key products, and (2) the regulatory consequences of the future application of their primary product. The Commission cautioned broker-dealers, shareholders, and prospective purchasers that they should carefully consider the foregoing information along with all other currently available information and any information subsequently issued by the Company. Further, the Commission advised that brokers and dealers should be alert to the fact that, pursuant to Rule 15c2-11 under the Securities Exchange Act of 1934 (the "Exchange Act"), at the termination of the trading suspension, no quotation may be entered unless and until they have strictly complied with all of the provisions of the rule. A copy of the full text of the Commission release, announcing the trading suspension, may be found at the following hyperlink: http://www.sec.gov/litigation/ suspensions/34-49513.htm.

On April 5, 2004, representatives of the Company, together with newly retained special securities counsel and newly retained FDA counsel, met with the Staff of the Commission (the "Staff") for the purpose of discussing the concerns that led to the suspension of trading of the Company's securities. During that meeting, the Company stated its intention to review its public disclosure, press releases and other public statements and to take whatever remedial action may be appropriate. It also represented that it would diligently seek to clarify the status of its products under current FDA regulations, would issue disclosure regarding the FDA regulation of its activities and products and the results of its dialogue with the FDA, and would endeavor to resolve on a timely basis any concerns communicated by the Staff. ***The Staff stated that it had been authorized by the Commission to seek injunctive relief against the Company, articulated the concerns that gave rise to the suspension of trading, and informally requested that the Company provide certain information to the Staff. The Company agreed to cooperate with the Staff, committed to review its disclosure promptly and committed to take any remedial action that may be required.***

The Company cannot predict what, if any, actions may be taken by the Commission; nor is the Company aware whether the FDA is contemplating any action against the Company. The Company, through counsel, intends to commence dialogue with the FDA promptly to address any FDA concerns.

***Due to the ongoing nature of this matter, the Company is unable to assess definitively its impact, except that the Company has committed not to sell its products until this matter has been concluded to the satisfaction of the Commission. The commitment to refrain from selling the Company's products may have a material adverse impact on the Company. The Company will make public announcements and will file***

*public reports with the Commission, when appropriate, including a complete description of regulations applicable to the Company's products and operations, as well as disclosure regarding the status of its products under applicable FDA regulations. No estimate can be given as to the date when the Company's efforts to revise its disclosure will be completed; nor can any estimate be given as to the date when its securities will resume trading. However, the Company is reasonably certain that the necessary disclosures and filings will not be made prior to the termination of the current trading suspension, and, therefore, the Company believes that its securities will not be able to be traded at that time. The Company will not seek to have its securities resume trading until it is reasonably comfortable that the concerns that gave rise to the trading suspension have been satisfactorily resolved.*

By letter dated April 2, 2004, the Nasdaq Listing Investigations department of The Nasdaq Stock Market, Inc. ("Nasdaq") notified the Company that it commenced an inquiry to ensure the Company's ongoing compliance with Nasdaq's inclusion requirements and requested certain information from the Company. The letter further disclosed that after review of the information provided by the Company, Nasdaq could take any action that may be appropriate under its Marketplace Rules including removal of the Company's securities from Nasdaq. In view of the substantial administrative and cash burdens being borne by the Company at this time, the Company has determined that it is in the best interest of shareholders to voluntarily cause its shares to be removed from Nasdaq so that the Company can focus its attention and resources on addressing the other issues addressed in this press release. *The Company has been informed that its securities will be delisted, effective the opening of the markets on Thursday, April 8, 2004.* At an appropriate time, the Company will seek to cause its securities to be quoted on an exchange, Nasdaq or an automated quotation system. There can be no assurance that the Company will be successful.

*The company urges investors not to rely on the company's existing reports filed pursuant to the exchange act, nor on any announcements, press releases or public statements issued by it or others relating to its financial condition, results of operations or its business or products generally, or any earnings guidance previously released by the company. The company further urges investors to refrain from trading in the company's securities until the company provides formal guidance that the concerns that are the subject of this release have been fully addressed.*

50.    Indeed, on April 8, 2004, the Company's stock was delisted by Nasdaq and is now quoted on the Pink Sheets for unsolicited trading under the symbol vaph.pk. As a

result of the delisting from Nasdaq and the Company's stock trading only on the Pink Sheets, the Company, if and when its stock resumes trading, will continue to suffer damages, including but not limited to: (i) a decreased ability to access the capital markets; (ii) an inability (for all practicable purposes) to use Company stock as currency for acquisitions; and (iii) increased difficulty securing debt financing on favorable terms. The Company's stock continues to trade only on the Pink Sheets.

51.    After the trading suspension and delisting, the Company's stock resumed trading on April 16, 2004 on the Pink Sheets and the Company's stock closed that day at $1.75 per share representing a 77% decline form its closing price on March 31, 2004 and resulting in a loss of $60.3 million in market capitalization.  The Company's stock continued to decline, becoming a penny stock and dropping to a low to $.38 per share. The Company's stock continues to be a penny stock trading only on the Pink Sheets and has not traded over at over $1.00 since September 1, 2004.

52.    On August 17, 2004, the SEC, after consultation with the FDA concerning Vaso, filed a complaint against the Company and Masiz, alleging they knowingly or recklessly made material misrepresentations and omissions in public statements and in the Company's filings made with the SEC by falsely claiming that, among other things, Vaso's Current Products had received FDA approval.  On September 13, 2004, the Company and Masiz settled with the SEC entering into Consent Decrees and Final Judgements wherein the Company was permanently enjoined from violating the antifraud and reporting provisions of the Securities Exchange Act, and defendant Masiz had to pay a $80,000 file and agree to be barred from serving as an officer or director of any public company for a period of five years.

53.    In addition, as a direct result of Vaso's delisting, the Company was forced to return a $7.5 million dollar investment made by Millennium Partners ("Millennium") in the Company in March 2004.  A subsidiary of Millennium called Riverview Group was the sole buyer of a $7.5 million convertible note issued by Vaso in a private transaction.  The Company was forced to return the $7.5 million because Vaso's trading suspension constituted a breach under the terms of the note which was to convert into Vaso stock when it reached $9 per share.  The Company entered into a settlement agreeing to return the $7.5 million plus expense reimbursements of $15,000.  Even more damaging, in connection with this transaction, the Company had paid approximately $600,000 in fees to various third-parties which were not refunded when the Company repaid the investor and thus the Company had to record these fees as expenses in the first quarter ended March 31, 2004.

54.    Additionally, for the nine months ended September 30, 2004, the Company had to incur and waste approximately $870,000 in legal and professional fees to amend its previously filed annual report, for representation before the SEC and FDA and to defend itself in the shareholder class actions.

55.    Finally, as a direct result of this illegal course of conduct, the Company has been exposed to tens of millions of dollars in potential liability for violations of the nation's securities laws and regulations and was named in numerous federal securities class action lawsuits filed in the United States District Court for the District of Massachusetts, on behalf of investors who purchased Vaso shares.  These lawsuits were consolidated into a single action before this Court captioned *In re Vaso Active Pharmaceuticals Securities Litigation*, Case No. 04-10708-RCL.  The consolidated class

action complaint in the securities fraud suit alleges that investors purchased shares of the Company based on false and materially misleading statements regarding the financial condition of the Company and that they have been significantly damaged thereby. Even worse, in the consolidated class action complaint the Company has been subjected to strict liability Under Section 11 of the Securities Act of 1933 for filing a false and misleading Registration Statement. All of the Individual Defendants, except Seifert, are defendants in the consolidated securities fraud action and all have filed answers in that action.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

56.     Plaintiffs bring this action derivatively in the right and for the benefit of Vaso to redress injuries suffered, and to be suffered, by Vaso as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Vaso is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

57.     Plaintiffs will adequately and fairly represent the interests of Vaso in enforcing and prosecuting its rights.

58.     Plaintiffs are and were owners of the stock of Vaso during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remain shareholders of the Company.

59.    The Board of Vaso at the time this action was initiated consisted of the following eight individuals: Director Defendants Masiz, Seifert, Carter, Shear, Strasnick, Adams, Anderson and Fromm.  Plaintiffs did not make any made any demand on the Board of Vaso to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

(a)    The Compensation Committee of the Board determines, after consulting with the CEO, establishes, authorizes and administers Vaso's compensation policies, practices and plans for Vaso's directors, executive officers and other key personnel. The Compensation Committee was comprised of defendants Shear, Strasnick, Adams and Anderson. As the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board would not institute this action against defendants Shear, Strasnick, Adams and Anderson.  To do so would jeopardize each defendant's personal financial compensation.  Thus, demand on defendants Masiz, Seifert, Carter and Fromm would have been futile;

(b)    The principal professional occupation of defendants Masiz, Carter and Seifert at the time this action was initiated was their employment with Vaso, pursuant to which they received and except for Masiz continue to receive substantial monetary compensations and other benefits.  Specifically, for FY:04, Masiz was to receive an annual base salary of not less than $175,000.  Carter was also to receive a salary for FY:04 of not less than $140,000.  Seifert was to receive a salary for FY:04 of not less than $200,000.  In addition, each were granted options to purchase Vaso stock and were entitled to bonuses.  Accordingly, defendants Masiz, Carter and Seifert lacked independence from defendants Shear, Strasnick, Adams and Anderson, who exerted

influence over defendants Masiz, Carter and Seifert's compensation by virtue of their position as members of the Compensation Committee. This lack of independence renders defendants Masiz, Carter and Seifert incapable of impartially considering a demand to commence and vigorously prosecute this action;

(c)    According to Vaso's Proxy Statements filed with the SEC, Director Defendants Shear and Strasnick served on the Audit Committee during the Relevant Period. The Audit Committee is responsible for reviewing the activities of Vaso's internal auditors and independent accountants. The Audit Committee is responsible for providing for the safekeeping of Vaso's assets; assuring the accuracy and adequacy of Vaso's records and financial statements; reviewing Vaso's financial statements and reports; monitoring compliance with Vaso's internal controls, policies, procedures and practices; and receiving direct compliance reports from Vaso's internal auditors and General Counsel and from the independent accountants. Nonetheless, the Audit Committee, with full knowledge of the false and misleading statements detailed herein recommended that the Board include the improper audited financial statements in Vaso's filings with the SEC during the Relevant Period without disclosing this material information. By such actions, these defendants breached their duties by causing or allowing the improper financials described above. As a result of these defendants' breach of their duties, any demand upon them would have been futile;

(d)    The entire Vaso Board at the time this action was initiated and senior management participated in the wrongs complained of herein. Vaso's directors were not disinterested or independent due to the following: Director Defendants Masiz, Seifert, Carter, Shear, Strasnick, Adams, Anderson and Fromm served on the Vaso Board

during the Relevant Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above-referenced defendants breached the fiduciary duties that they owed to Vaso and its shareholders in that they failed to reveal to the public the truth concerning their key and primary products despite having such knowledge. Each of the Director Defendants with the exception of Seifert signed the Company's materially false and misleading Registration Statement and each of the Director Defendants signed the Company's materially false and misleading Annual Report for FY:03. Thus, the Vaso Board could not have exercised independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members were interested personally in the outcome as it is their actions that have subjected Vaso to millions of dollars in liability for possible violations of applicable securities laws;

(e) The Director Defendants of Vaso, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Vaso's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

(f) As detailed herein at ¶¶23-30, in order to bring this suit, all of the directors of Vaso would have been forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they would not do, thereby excusing demand. As set forth in particularity in ¶¶23-30, because a majority of the Director Defendants had and continued to have long-term personal, professional and financial relationships with each other and other board members, a majority of the

Director Defendants could not have adequately considered a demand to bring the allegations made herein rendering any such demand futile;

(g)     The acts complained of constitute knowing violations of the fiduciary duties owed by Vaso's officers and directors and these acts are incapable of ratification;

(h)     Each of the Director Defendants authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

(i)     Any suit by the Director Defendants to remedy these wrongs would likely expose the Director Defendants and Vaso to further violations of the securities laws that would result in civil actions being filed against one or more of the Director Defendants; thus, they were hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(j)     Vaso has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Vaso any part of the damages Vaso suffered and will suffer thereby;

(k)     If the Director Defendants were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies

allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defence of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Director Defendants. In essence, they would be forced to take positions contrary to the defences they will likely assert in the securities class actions. This they would not have done. Thus, demand was futile; and

(l)     Vaso's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Vaso. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, plaintiffs assert, upon information and belief, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Vaso against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Vaso, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause Vaso to sue them, since they will face a large uninsured liability.

60.    Moreover, despite the Director Defendants having knowledge of the claims and causes of action raised by plaintiffs, the current Board has failed and refused to seek to recover for Vaso for any of the wrongdoing alleged by plaintiffs herein.

61.    Plaintiffs have not made any demand on shareholders of Vaso to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Vaso is a publicly held company with approximately 5.8 million shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

## DAMAGES TO VASO

62.    As a direct result of Individual Defendants' breaches of their fiduciary duties and other violations of law and BioChemics' breaches of their fiduciary duties and other violations of law, the Company has been severely and irreparable damaged, including, but not limited to:

(a)    As a result of the delisting from Nasdaq and the Company's stock trading only on the Pink Sheets suffering damages, including but not limited to: (i) a decreased ability to access the capital markets; (ii) an inability (for all practicable purposes) to use Company stock as currency for acquisitions; and (iii) increased difficulty securing debt financing on favorable terms;

(b)    Having to unwind a private transaction of $7.5 million entered into with a an institutional investor causing the Company to have to waste over $600,000 in expense reimbursements and fees paid to third parties;

(c)    Having to incur and waste approximately $870,000 in legal and professional fees to amend its previously filed annual report, for representation before the SEC and FDA and to defend itself in   shareholder class actions brought against the Company;

(d)    Being exposed to tens of millions of dollars in potential liability for violations of federal and state law, including the federal securities laws, which will cost the Company millions to defend and tens of millions more to settle; and

(e)    Suffering severe and irreparable damage to its credibility, reputation and goodwill.

## CAUSES OF ACTION

## COUNT I

**Against All Defendants for Breach of Fiduciary Duty**

63.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

64.    The defendants, including defendant BioChemics, owed and owe Vaso fiduciary obligations.  By reason of their fiduciary relationships, the defendants owed and owe Vaso the highest obligation of good faith, fair dealing, loyalty and due care.

65.    The defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

66.     Each of the defendants had actual or constructive knowledge that they had caused the Company to improperly issue materially false and misleading information as described herein and failed to correct the Company's public filings and press releases. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

67.     As a direct and proximate result of the defendants' failure to perform their fiduciary obligations, Vaso has sustained significant damages.  As a result of the misconduct alleged herein, the defendants are liable to the Company.

68.     Plaintiffs on behalf of Vaso have no adequate remedy at law.

## COUNT II

### Against All Defendants for Abuse of Control

69.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

70.     The defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Vaso, for which they are legally responsible.

71.     As a direct and proximate result of the defendants' abuse of control, Vaso has sustained significant damages.

72.     As a result of the misconduct alleged herein, the defendants are liable to the Company.

73.     Plaintiffs on behalf of Vaso have no adequate remedy at law.

## COUNT III

### Against All Defendants for Gross Mismanagement

74.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

75.    By their actions alleged herein, the defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Vaso in a manner consistent with the operations of a publicly held corporation.

76.    As a direct and proximate result of the defendants' gross mismanagement and breaches of duty alleged herein, Vaso has sustained significant damages in excess of tens of millions of dollars.

77.    As a result of the misconduct and breaches of duty alleged herein, the defendants are liable to the Company.

78.    Plaintiffs on behalf of Vaso have no adequate remedy at law.

## COUNT IV

### Against All Defendants for Waste of Corporate Assets

79.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

80.    As a result of the improper statements and nondisclosures, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, the defendants have caused Vaso to waste valuable corporate assets by paying incentive based bonuses and stock options to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions including responding the SEC's allegations and securities fraud actions as well as wasting over $600,000 in expenses relating to having to

unwind the private transaction. As a result of the waste of corporate assets, the defendants are liable to the Company.

81.    Plaintiffs on behalf of Vaso have no adequate remedy at law.

## COUNT V

### Against All Defendants for Unjust Enrichment

82.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein. By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Vaso.

83.    Plaintiffs, as shareholders and representatives of Vaso, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    Awarding to Vaso restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

C.    Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

     D.     Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: March 7, 2005          Respectfully submitted,


/s/ Mary T. Sullivan_____
Mary T. Sullivan, BBO #487130
SEGAL ROITMAN & COLEMAN
11 Beacon Street, Suite 500
Boston, MA 02108
Telephone: 617/742-0208
Facsimile: 617/742-2187

Plaintiffs' Liaison Counsel

George E. Barrett
Douglas S. Johnston, Jr.
Timothy L. Miles
BARRETT, JOHNSTON & PARSLEY
217 Second Avenue, North
Nashville, TN 37201
Telephone: 615/244-2202
Facsimile: 615/252-3798

Plaintiffs' Lead Counsel

Brian J. Robbins
Jeffrey Fink
ROBBINS UMEDA & FINK, LLP
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3991

Plaintiffs' Counsel

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true cope of the Consolidated Complaint  was served upon the attorney of record of each party by via first class mail, a true copy of the foregoing Plaintiff's Unopposed Motion to Restore Action to Docket was served upon Jeffrey B. Rudman and Michael G. Bongiorno, and Wilmer, Cutler, Pickering, Hale & Dorr, 60 State Street, Boston, MA  02109 and John A. Sten and Kay B. Lee, Greenberg Traurig, LLP, One International Place, Boston, MA 02110, Richard S. Kraut, Dilworth Paxson, 1818 N. St. N.W., Suite 400, Washington D.C. 20036, on March 7, 2005.

/s/ Mary T. Sullivan
Mary T. Sullivan

L\mts\7633\pleadings\Consolidated Complaint